# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Personal Restraint of: | No. 58157-4-II |
| CHARLES FRANCIS ROARK, | |
| Petitioner. | UNPUBLISHED OPINION |

VELJACIC, A.C.J. — Charles Roark seeks relief from personal restraint imposed following a guilty finding for a Department of Corrections (DOC) WAC 137-25-030(1) category A, 603 serious infraction (603 serious infraction) for introducing or transferring unauthorized drugs or paraphernalia while incarcerated. Roark argues that insufficient evidence supported a guilty finding and that he was denied a fair proceeding. We hold that sufficient evidence supported the guilty finding, and that Roark has not shown that the disciplinary decision was so arbitrary and capricious that it denied him a fundamentally fair proceeding or that he was prejudiced by the process he received. We dismiss the petition.

## FACTS

On May 8, 2022, former DOC inmate Max Fiest and his girlfriend Nikki Schab were on their way to Cedar Creek Corrections Center (CCCC) to collect property belonging to Fiest. Their vehicle broke down near the facility on Bordeaux Road. Schab walked to the perimeter control office for help while Fiest remained in the car with their dogs. When Schab reached the office, she asked Investigator Colin Crouthamel for assistance and he went to inspect the vehicle.

Crouthamel noted a strong odor of marijuana inside the car. The vehicle was towed later that evening.

That same evening, CCCC Officer John Gurley ended his shift and left the facility via Bordeaux Road. He noticed a man and a woman walking a dog, and noted that the woman was carrying a dark colored backpack with "reddish coloring on what looked like the edges." Pers. Restraint Pet. (PRP) Ex. 4. The next morning, in the same location off the side of the road, Officer Carl Wilson found a black backpack with red straps containing tobacco. CCCC Investigator Heather Luck further inspected the contents of the bag. It contained two glass pipes, four syringes, one lighter, three packs of rolling papers, and 92.4 grams of methamphetamine.

Prior to the car breaking down and the discovery of the bag, Fiest and Roark had been in contact, exchanging JPAY messages. In those messages, they discussed dinner plans with their girlfriends, Schab and Brenda Bauman[1], scheduled for May 8. During the investigation, no other correspondence was found between Roark and another female discussing dinner plans. On May 8, a conversation was overheard where Fiest states, "I'm chillin, getting into town right now. About to go to my storage unit in a couple hours you know." Br. of Resp't at Ex. 2. These conversations led Crouthamel to believe that Roark and Fiest were conspiring to introduce contraband into the CCCC.

---

[1] Brenda Bauman is Roark's ex-girlfriend. She resides in Baccoda, near the CCCC. Fiest explains the May 8 events as follows: "[Roark] said that a friend of his, Brenda Bauman, had a trailer on her property that she wanted removed. Mr. Roark asked me if I would be willing to remove it and store it for him, so he could live in it upon his release in 2024." PRP at Ex. 18. Bauman also submitted a declaration in which she explains that Roark arranged for a friend of his, Fiest, to remove the trailer and take it somewhere. Bauman explains that she believes they came to her residence for dinner on the date in question, May 8, 2022.

On May 10, Crouthamel interviewed Roark about the recovered backpack. According to the infraction report completed by Crouthamel, in that interview Roark admitted to conspiring to introduce the contents of the backpack into the CCCC.

Roark was accused of a "603" serious infraction, "introducing or transferring any unauthorized drug or drug paraphernalia." At the hearing, Roark entered a plea of not guilty. He argued that in his conversations with Fiest, he was making genuine dinner plans, and that he did not confess to Crouthamel in the interview. Roark did not request any witnesses at the hearing.

Roark was found guilty of the serious infraction. The sanctions he received included: 90 days of urinalysis testing, 180 days interruption of telephone and electronic communication privileges, 75 days loss of good conduct time, and 17 days segregation with credit for time served. Roark appealed, and the infraction was affirmed. Roark then filed this personal restraint petition (PRP).

## ANALYSIS

### I.    LEGAL PRINCIPLES

To be entitled to relief via PRP, a petitioner needs to show that they are restrained under RAP 16.4(b) and that the restraint is unlawful under RAP 16.4(c). *In re Pers. Restraint of Grantham*, 168 Wn.2d 204, 212-13, 227 P.3d 285 (2010). A personal restraint petitioner is entitled to full collateral review of a conviction or sentence if the petitioner proves actual prejudice from a constitutional error, or nonconstitutional error which inherently results in a complete miscarriage of justice. *In re Pers. Restraint of Cook*, 114 Wn.2d 802, 813, 792 P.2d 506 (1990). Specifically, in a PRP challenging a prison disciplinary sanction, such a decision is reviewable only if the action taken was "so arbitrary and capricious as to deny the petitioner a fundamentally fair proceeding." *In re Pers. Restraint of Reismiller*, 101 Wn.2d 291, 294, 678 P.2d 323 (1984). "'Arbitrary and

capricious action has been defined as willful and unreasoning action, without consideration and in disregard of facts and circumstances. Where there is room for two opinions, action is not arbitrary and capricious even though one may believe an erroneous conclusion has been reached.'" *Id*. at 296 (quoting *Pierce County Sheriff v. Civil Serv. Comm'n*, 98 Wn.2d 690, 695, 658 P.2d 648 (1983)).

A prison disciplinary proceeding is not arbitrary and capricious if the petitioner was afforded minimum due process protections applicable in such cases. *In re Pers. Restraint of Anderson*, 112 Wn.2d 546, 548-49, 772 P.2d 510 (1989). A prisoner enjoys more limited due process rights than a criminal defendant. *Reismiller*, 101 Wn.2d at 296-97.

> Minimum due process in these cases means the prisoner must (1) receive notice of the alleged violation; (2) be provided an opportunity to present documentary evidence and call witnesses when not unduly hazardous to institutional safety and correctional goals; and (3) receive a written statement of the evidence relied upon and the reasons for the disciplinary action.

*In re Pers. Restraint of Gronquist*, 138 Wn.2d 388, 397, 978 P.2d 1083 (1999).

When challenging a prison disciplinary decision under this standard, the offender must present evidence that is more than speculation or conjecture. *Id*. at 396. A PRP must be supported by facts or evidence underlying the claim of unlawful restraint. *In re Pers. Restraint of Rice*, 118 Wn.2d 876, 885-86, 828 P.2d 1086 (1992); *Cook*, 114 Wn.2d at 813-14. When a petitioner relies exclusively on conclusory allegations, a court should decline to determine the validity of the petition. *Cook*, 114 Wn.2d at 813-14.

Further, we do not impose the same evidentiary requirements on prison disciplinary proceedings as are imposed on criminal trials; rather, when a prison disciplinary committee finds an inmate guilty of an infraction, the requirements of due process are satisfied if "some evidence" supports the decision. *Reismiller*, 101 Wn.2d at 296-97; *Anderson*, 112 Wn.2d at 548. In order to

4

satisfy the "some evidence" test, there must be some reasonable connection between the evidence and the inmate. *Anderson*, 112 Wn.2d at 549.

For example, in *Anderson*, the court reviewed a PRP based on a prison disciplinary proceeding finding the petitioner guilty of an infraction of possession of a knife. *Id*. at 548. The knife was found in the petitioner's cell, which he shared with three other inmates. *Id*. at 550. In dismissing the petition, the court held that a sufficient connection did exist between the petitioner and the knife to satisfy the limited nature of due process available to incarcerated felons. *Id*. at 549. The court reasoned that the fact that there was a knife found in the cell is *some* evidence that any one of the four cellmates, or all four of the cellmates, either possessed the knife, placed the knife in the cell, or at least knew of its presence in the cell. *Id*. at 550. The court also noted that "[w]hile such evidence may be insufficient to satisfy due process in a nonprison setting, because a lesser standard is required to satisfy the rights of prison inmates, due process in this case was satisfied." *Id*.

These fundamental due process protections apply only to disciplinary actions that implicate a protected liberty interest. *Kozol v. Dep't of Corr.*, 185 Wn.2d 405, 409-10, 379 P.3d 72 (2016). In serious infraction hearings where sanctions include loss of good time credits, as is the case here, Washington prisoners are entitled to minimum due process. *Gronquist*, 138 Wn.2d at 397. But even where no liberty interest is implicated, a disciplinary action may be challenged by a PRP on other grounds, such as violation of regulations governing disciplinary proceedings. *Kozol*, 185 Wn.2d at 410-11.

II.   ROARK WAS AFFORDED DUE PROCESS

In examining Roark's petition under this standard, we hold that he received the requisite due process. As previously stated, a prisoner enjoys more limited due process rights than a

criminal defendant, requiring only that he: (1) receive notice of the alleged violation, (2) be provided an opportunity to present documentary evidence and call witnesses, and (3) receive a written statement of the evidence relied on and the reasons for the disciplinary action. *Gronquist*, 138 Wn.2d at 396-97; *Reismiller*, 101 Wn.2d at 296-97. Roark was afforded all three of these requirements: he received a copy of the written notice of the serious infraction more than 24 hours before the hearing took place; he was provided the opportunity to present evidence and call witnesses at the hearing, which he did not do; and he was issued a copy of the minutes of the disciplinary hearing and the findings form after the hearing.

Roark primarily argues that his due process rights were violated because there is no recording of the interview in which Crouthamel claims that Roark confessed. Roark appears to assert that because an infraction hearing is normally where a confession would occur, and the interview was closely related to the soon-to-follow infraction hearing, the interview should be seen as part of the infraction hearing process, which would require it to be recorded. *See* DOC Policy 460.000. But the interview Roark is referring to was not an infraction hearing. Roark points to no authority that would obligate DOC to record the interview, and the actual infraction hearing was recorded pursuant to DOC policy. *See* DOC Policy 460.000. Failure to record this interview does not violate Roark's due process rights or demonstrate that the disciplinary process was so "arbitrary and capricious" as to deny Roark a fundamentally fair proceeding.

Roark also argues that multiple violations of DOC policy occurred when investigating officers brought methamphetamine into a DOC facility, which by itself should establish the unlawfulness of the infraction. Presumably, Roark is arguing that a violation of DOC policy establishes he was denied due process. *See In re Pers. Restraint of Cashaw*, 123 Wn.2d 138, 141-42, 866 P.2d 8 (1994).

6

Noncompliance with certain regulations can be a basis for relief. In *Cashaw*, the petitioner challenged the actions of the Indeterminate Sentence Review Board (ISRB) in setting his minimum prison term to coincide with the remainder of his court-imposed maximum sentence. *Id*. at 140. This was in violation of the ISRB's own procedural rules for parolability hearings. *Id*. at 147. The court explained that where the petitioner had no previous or alternative avenue for obtaining review, and the restraint was only accomplished through a violation of the ISRB's own regulations, the petitioner was entitled to relief. *Id*. at 149.

However, a petitioner does not establish a basis for relief if the alleged noncompliance did not prevent a prisoner from mounting a defense at a previous venue for obtaining review. For example, in *Grantham*, the petitioner argued that the infraction report against him did not comply with certain prison regulations and therefore he was denied due process. 168 Wn.2d at 216. The alleged violation was the failure of the investigating officer to include the time and place of the incident with specificity, and a required time stamp in the report was missing. *Id*. The petitioner asserted that this entitled him to relief under *Cashaw*, 123 Wn.2d at 140. *Id*. The court dismissed the petition, reasoning that any error in the infraction report did not prevent Grantham from mounting a defense because he was still informed of the charges against him, the factual basis for those charges, and given an opportunity to defend himself. *Id*. at 217. In other words, despite the violation of internal policy, it was sufficient that the petitioner had a previous opportunity to obtain review and present his case, and the violation did not impact his ability to do so.

We reject Roark's argument for the same reasons as discussed by the court in *Grantham*. Even if a violation of DOC policy occurred, this alleged violation did not prevent Roark from mounting a defense at his hearing: he was informed of the charges against him, the factual basis for those charges, and given an opportunity to defend himself. This alleged violation based on

7

bringing methamphetamine into a DOC facility does not result in Roark being denied a fundamentally fair proceeding nor does it follow that he was prejudiced by the process he received, especially where he was previously afforded an avenue to obtain review. *See Grantham*, 168 Wn.2d at 218.

We hold that Roark was afforded the requisite due process.

III.     THE GUILTY FINDING WAS BASED ON "SOME EVIDENCE"

Roark asserts that the "some evidence" standard was not met here, because the evidence against him was circumstantial and inconsistent. We disagree.

In order to satisfy the "some evidence" test, there must be some reasonable connection between the evidence and the inmate. *Anderson*, 112 Wn.2d at 549. In the case of conspiracy to introduce or transfer any unauthorized drug or drug paraphernalia, as is alleged here, the general rule is that "there need be no evidence of a formally expressed agreement between the alleged conspirators." *State v. McGonigle*, 144 Wash. 252, 257, 258 P. 16 (1927); *see* WAC 137-25-030(1) category A, 603. Circumstantial evidence of a "meeting of the minds and unity of design and of co-operative conduct which could only mean that there was such an agreement" is sufficient. *Id*.

Roark reasons that there is no evidence of any such connection between him and any CCCC staff member, he has no drug history, he has been "major infraction-free" for nearly a decade, and there is also no evidence of his realizing financial gain. PRP at 16. Roark raised these points at his hearing. However, where there is room for two opinions, a disciplinary action is not arbitrary and capricious even though one may believe an erroneous conclusion has been reached. *Reismiller*, 101 Wn.2d at 296. Based on the record before us, there is room for two opinions. The hearing officer reviewed the initial serious infraction report and the incident report, both of which

8

describe how Roark was in communication with Fiest as to dinner plans on May 8, 2022 *and* Fiest was seen outside of the CCCC with Schab on May 8. Additionally, Fiest and Schab were spotted walking down Bordeaux Road with a red and black backpack. The next day, a red and black backpack containing contraband was discovered on Bordeaux Road outside of CCCC. The initial serious infraction report from Crouthamel, supported by photo evidence curated by Luck, details how the circumstantial evidence shows that Fiest intended to transmit contraband to Roark.

Roark would like us to reexamine the entire record, when the standard is only "some evidence." Based on the evidence listed above, all of which was considered by the hearing officer, there is certainly "some evidence" to support the guilty finding as well as room for two opinions. *See Reismiller*, 101 Wn.2d at 296. This is true even if some of the evidence is circumstantial and Roark believes the conclusion to be erroneous. *See id.* Circumstantial evidence is sufficient where conspiracy is alleged and, while this evidence may be insufficient to satisfy due process in a nonprison setting, because a lesser standard is required to satisfy the rights of prison inmates, due process in this case was satisfied. *See Anderson*, 112 Wn.2d at 550; *McGonigle*, 144 Wash. at 257.

Roark argues that the "some evidence" standard is not met because the disciplinary decision relied entirely on Crouthamel's report that Roark confessed. But an infraction report from a staff member is sufficient to meet the "some evidence" standard required here. *In re Pers. Restraint of Leland*, 115 Wn. App. 517, 537, 61 P.3d 357 (2003) ("For example, the hearsay report of a prison official who did not witness an infraction can constitute 'some evidence' to support the conclusion of guilt for the infraction."), *abrogated on other grounds by In re Pers. Restraint of Higgins*, 152 Wn.2d 155, 95 P.3d 330 (2004). Crouthamel's report is a valid form of evidence supporting the guilty finding.

Roark also argues that Crouthamel's report should not be relied on. He alleges that Crouthamel is not credible because he "has a notorious reputation for dishonesty and poorly founded infractions among DOC offenders" and has a "less than sterling record as an investigator." PRP at 12. Roark speculates as to why Crouthamel would be dishonest about his confession, saying that "Crouthamel would have appeared quite the failure at his new job, if he did not do whatever was necessary to justify his infraction and make it stick," and "[o]nly by infracting [] Roark, and bolstering the otherwise all but baseless infraction with a fabricated confession, could [] Crouthamel save face, salvage his first day on the job, and his first big investigation at CCCC." PRP at 13, 17. According to Roark, because Crouthamel is not credible and the guilty finding was based on his report alone, the report should not be relied on, and the "some evidence" standard is not met.

Roark does not offer any concrete evidence to support his allegation that Crouthamel is lying. Roark merely makes conclusory allegations and speculates as to why Crouthamel would be dishonest. *Cook*, 114 Wn.2d at 813-14 ("Where the record does not provide any facts or evidence on which to decide the issue and the petition instead relies solely on conclusory allegations, a court should decline to determine the validity of a [PRP]."). But again, as we concluded above, there is some evidence supporting the decision. We are not required to view the evidence in Roark's favor.

Further, Crouthamel's report was accompanied by other evidence supporting the guilty finding: Roark had prior communication with Fiest; Fiest was present outside the CCCC on May 8, 2022, the date they discussed; and multiple witnesses who saw Fiest and Schab in possession a black and red backpack which was found the next day containing contraband. The guilty finding was based on "[s]taff written testimony," not solely Crouthamel's report. Br. of Resp't at Ex. 1,

Att. F. The aforementioned qualifies as some evidence connecting Roark to the offense. *See Anderson*, 112 Wn.2d at 549.

Based on the aforementioned, we hold that the "some evidence" standard was met here.

CONCLUSION

Roark was afforded minimum due process. Roark has not shown that the disciplinary decision was so arbitrary and capricious that it denied him a fundamentally fair proceeding or that he was prejudiced by the process he received. The decision was based on some evidence. We dismiss the petition.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Veljacic, A.C.J.

We concur:

_____
Maxa, J.

_____
Che, J.